TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-95-00029-CV







Cactus Canyon Quarries of Texas, Inc./Joe R. Williams, Louise Williams,


and Texas Architectural Aggregates, Inc., Appellants



v.



Joe R. Williams, Louise Williams, and Texas Architectural Aggregates, Inc./


Cactus Canyon Quarries of Texas, Inc., Appellees







FROM THE DISTRICT COURT OF BURNET COUNTY, 33RD JUDICIAL DISTRICT


NO. 9752, HONORABLE V. MURRAY JORDAN, JUDGE PRESIDING








 This appeal arises from the second portion of a bifurcated trial governing the
ownership of certain granite/mineral rights between appellant Cactus Canyon Quarries of Texas,
Inc. ("Cactus Canyon") and appellees (collectively, the "Williamses"). The first trial ("Cactus
Canyon I") decided the title issues. This Court held that appellant had superior title to the granite
at issue. We reversed the judgment and remanded the cause to the trial court for further
proceedings. Cactus Canyon v. Williams, No. 3-90-219-CV (Tex. App.--Austin August 12, 1992,
writ denied) (not designated for publication). The second trial ("Cactus Canyon II") decided the
damages caused by appellees' trespass and conversion in mining appellant's granite. A jury found
that appellees had trespassed in good faith and were therefore entitled to offset their costs from
the trespass damages. Appellant filed this appeal, along with a notice of limitation of appeal,
challenging whether appellees were permitted to offset their production costs from the damages. 
Thereafter, appellees filed their own appeal and challenged the calculation used to value the
granite at issue. We will affirm the trial court's judgment.



THE CONTROVERSY


 Cactus Canyon and the Williamses are competitors in the specialty manufacture and
supply of various crushed and sized rocks and minerals, both operating quarries in the same
vicinity of Burnet County. Because the issues in this case arise from the same facts as Cactus
Canyon I, we will restate some of the salient facts from the earlier case.

 This dispute involves part of a 66.93-acre tract of land located in Burnet County,
Texas. See diagram below. 













 In 1939, the property had been included in a conveyance from Koon to O'Donnell. 
The 66.93-acre tract was created in a 1943 deed from O'Donnell to Parks conveying a 17.56-acre
tract and a portion of an adjoining 117-acre tract. The controversy arose out of O'Donnell's
reservation of granite rights in this deed. The parties have never disputed on appeal Cactus
Canyon's superior right to granite in the northern 17.56 acres. The southern portion, below a line
designated the "TGC Granite Line," was not at issue in Cactus Canyon I. At issue was the right
to the granite in the land lying between the undisputed portions of the tract, designated by the
parties as the "gap."

 Joe Williams owns the surface of the 66.93-acre tract by virtue of two
conveyances to him in 1984, one from Sally Williams and one from Frank and Mary Louise
Reading. Jack Carson (the president of, and predecessor in title to, Cactus Canyon Quarries and
party to the suit in Cactus Canyon I) claimed the granite rights in the tract by virtue of two 1984
leases: (i) from O'Donnell to Carson purportedly covering all the 66.93-acre tract, and (ii) from
Carson and Fairland Investment Company ("FIC"), a general partnership of which Jack Carson
is the general partner, to Cactus Canyon Quarries covering the 17.56-acre tract. See chart below. 








 The Williamses contended that O'Donnell's 1943 deed conveyed to Parks a "gap,"
lying between the 17.56-acre tract and the 117-acre tract. According to the Williamses,
O'Donnell did not reserve for himself the granite in the gap. Consequently, the Williamses
contended that these granite rights passed to Parks and eventually to them. Carson contended
there was no gap, but that in any event O'Donnell reserved all the granite rock in the disputed
area and conveyed it by lease to him.

 Before filing Cactus Canyon I, Sally Williams (predecessor in title to the
Williamses) filed an earlier action, to quiet title to granite rights in an 80-acre tract of land
conveyed to her in 1976. The disputed gap was included in the property placed at issue. The
plaintiffs sought judgment for fee simple ownership of the granite rights in the subject property,
but the trial court dismissed the cause with prejudice to the plaintiffs.

 In Cactus Canyon I, this Court left undisturbed that part of the trial court's ruling
that there was no gap because the 17.56-acre tract and the remainder of the 66.93-acre tract
adjoined and abutted; that there was no vacancy in title; and adjudging that the 17.56-acre tract
and the 117-acre "first tract" in the 1939 Koon deed adjoin and abut. This Court went on to hold
that (i) res judicata barred Sally Williams from asserting any granite rights to property described
in her pleadings of the prior suit to quiet title against Jack Carson (predecessor in title to Cactus
Canyon); and (ii) Carson had superior title as against David Williams and Texas Architectural
Aggregates, Inc., by operation of the doctrine of common source.

 After this Court held that Cactus Canyon had established superior right of title over
Williams, on remand the trial court proceeded to determine the amount of trespass damages
Cactus Canyon had incurred as a result of the Williamses' mining of its granites. The jury
determined that the Williamses trespassed in good faith, and therefore the trial court permitted
them to offset their production costs from the damages. Cactus Canyon filed a limited appeal
challenging the Williamses right to offsets. The Williamses perfected their own appeal as to the
proper valuation of the granite they mined.



 DISCUSSION


 Appellant raises fourteen points of error on appeal that fall into six categories: (1)
the trial court erred in submitting question six to the jury regarding willful trespass (points of
error one, four, five, and eight); (2) the trial court erred in submitting question five to the jury
regarding the costs of producing the granite at issue (points of error nine and ten); (3) the trial
court erred in failing to submit to the jury certain questions and instructions regarding willful
trespass (point of error seven); (4) the trial court erred in admitting certain testimony pertaining
to the issue of title (points of error two and three); (5) the evidence was factually and legally
insufficient to support the jury answer to question five (points of error thirteen and fourteen); and
(6) the trial court erred in overruling appellant's Motion for New Trial (points of error six,
eleven, and twelve). In partial response, appellees urge that many of these complaints have not
been preserved for appeal.

 In calculating damages, the trial court allowed appellees a credit for the costs they
incurred in mining and processing the granite. They were only entitled to this offset if they
trespassed in good faith. See Bender v. Brooks, 127 S.W. 168, 171 (Tex. 1910); Maxville-Glasco
Drilling Co., Inc. v. Royal Oil & Gas Corp., 800 S.W.2d 384, 386 (Tex. App.--Corpus Christi
1990, writ denied); Hunt v. HNG Oil Co., 791 S.W.2d 191, 193-94 (Tex. App.--Corpus Christi
1990, writ denied) (good faith trespasser entitled to deduct mining costs from damages). Appellant
originally limited its appeal to the issue of appellees' entitlement to this credit and thus to the issue
of whether appellees acted in bad faith as a matter of law or their failure to prove their good faith
defense.



Submission of Question Number Six

 In points of error one, four, five, and eight, appellant maintains for various reasons
that the trial court erred in submitting question number six to the jury. (1) The question concerned
the Williamses' affirmative defense of acting in good faith. In partial response, appellees point
out that appellant did not object to the submission of question six and therefore has failed to
preserve for appellate review any complaint directed to submission of the question. See Tex. R.
App. P. 52(a). In order to complain on appeal that an issue in the trial court's charge is
erroneous, a party must timely, properly, and distinctly object, or the complaint is waived. See
Tex. R. Civ. P. 272, 274; Baptist Memorial Hosp. Sys. v. Smith, 822 S.W.2d 67, 74 (Tex.
App.--San Antonio 1991, writ denied). A party who objects to an alleged defect in the submission
of an issue, definition, or instruction must point out its objection with particularity. Id. (citing
Tex. R. Civ. P. 274) (emphasis added). Further, any submission complaint based upon a defect
in pleading must be specifically included or the objection is waived. Tex. R. Civ. P. 274. The
record reveals that appellant did not object on any basis to the submission of question six. 
Appellant's only mention of question six is in its objection to question five. (2)

 Appellant replies that it properly preserved error by requesting an issue on which
it did not have the burden of proof. See State Dep't of Highways v. Payne, 838 S.W.2d 235, 239-40 (Tex. 1992); Tex. R. Civ. P. 278. We do not agree. Appellant's points of error one, four,
five, and eight assert that the trial court erred in submitting question six to the jury in any form,
not that the court erred in refusing to submit appellant's version of question six, as was the case
in Payne. We cannot see where appellant made the trial court aware of its complaint that it should
not have asked the jury at all whether appellees acted willfully or instructed them on good faith. 
See id. at 241. Instead, appellant simply challenged the proposed wording of question six. 
Appellant cannot argue at trial that the issue should go to the jury but in a differently worded
question, and then argue on appeal that the issue should not go to the jury at all because it is
foreclosed as a matter of law. See Holland v. Hayden, 961 S.W.2d 763, 765 (Tex. App.--Houston
[14th Dist.] 1995, writ denied) (complaint on appeal must comport with objection at trial). 
Further, appellant refer us to twenty-five pages in the transcript containing a multitude of
questions and instructions it requested. Appellant does not specify which one preserved error on
question six, and we decline to search the record towards this end. Appellant failed to object to
the trial court's submission of question six and has not preserved this issue for appellate review. 
Therefore, we overrule points of error one, four, five, and eight.



Failure to Submit Question Testing Appellees' Burden on the Issue of Willful Trespass

 In point of error seven, appellant asserts that the trial court erred by not submitting
question six accompanied by an instruction that would properly test appellees' burden to rebut the
presumption of willful trespass mining. Again, appellant did not lodge a complaint at trial as to
submission of question six. The jury found that appellees did not act willfully.

 In its very brief discussion of this complaint, appellant cites no authority in support
of its claimed error. Therefore, any error is waived. Appellant directs the court to four
differently worded questions and/or instructions in the record that it requested but does not direct
this Court to precisely which of these the trial court should have submitted. Appellant's point of
error seven is multifarious. "A point of error is multifarious if it embraces more than one specific
ground of error, or if it attacks several and distinct and separate rulings of the court." Clancy v.
Zale Corp., 705 S.W.2d 820, 823 (Tex. App.--Dallas 1986, writ ref'd n.r.e.). This Court may
disregard any assignment of error that is multifarious. Id. at 824. Therefore, we overrule point
of error seven.




Admission of Testimony Pertaining to Title

 In points of error two and three, appellant complains that the trial court erred in
admitting testimony and argument pertaining to the underlying title dispute litigated in Cactus
Canyon I. At various places in the record, numerous witnesses testified as to some of the issues
litigated in Cactus Canyon I as they pertained to the issue of whether appellees trespassed in good
faith. During jury argument, appellees referred to some of this evidence. At no time did
appellant object to the admission of this evidence at the time the testimony was produced. 
Appellant also did not object to appellees' jury argument. To preserve error on the admission of
evidence, a party must raise a contemporaneous objection to specific evidence stating specific
objectionable grounds. See Tex. R. App. P. 52(a); Hartford Accident & Indem. Co. v.
McCardell, 369 S.W.2d 331, 335 (Tex. 1963). Likewise, to preserve error on improper jury
argument, generally a party must timely object. Turner v. Turner, 385 S.W.2d 230, 237 (Tex.
1964). The record reveals that appellant did not properly object to the testimony, nor to the jury
argument. Therefore, we overrule points of error two and three.


Sufficiency of Evidence as to Willful Trespass

 In point of error six, appellant alleges that the trial court erred in overruling its
motion for new trial because the record contains insufficient evidence to support the jury's answer
to question six. While it is not precisely clear, appellant's brief suggests a factual, not legal,
challenge to the sufficiency of the evidence.

 Before addressing the factual sufficiency of the evidence, we note the well settled
rule that the issue of good faith is generally a question of fact. Lowder v. Schluter, 14 S.W. 205,
206 (Tex. 1890); Gulf Prod. Co. v. Spear, 84 S.W.2d 452, 457 (Tex. 1935); Whelan v.
Killingsworth, 537 S.W.2d 785, 786 (Tex. Civ. App.--Texarkana 1976, no writ). The courts have
carved out at least one exception to this general rule: a party is deemed, as a matter of law, to act
in bad faith when one trespasses "with full knowledge of the pendency of an action to enforce an
adverse claim to the premises." Houston Prod. Co. v. Mecom Oil Co., 62 S.W.2d 75, 77 (Tex.
1933). In the instant cause, this "mining pending litigation" exception is not at issue because
appellant did not properly preserve its allegation of error for appellate review. Therefore, the
issue of good faith in the instant cause is one of fact.

 When reviewing a jury verdict to determine the factual sufficiency of the evidence,
we must consider and weigh all the evidence and should set aside the judgment only if it is so
contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. 
Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986); In Re King's Estate, 244 S.W.2d 660, 661 (Tex.
1951); Texas Dep't of Human Servs. v. Green, 855 S.W.2d 136, 145-46 (Tex. App.--Austin 1993,
writ denied); Kentor v. Karotkin, 852 S.W.2d 261, 266 (Tex. App.--Austin 1993, writ denied);
see generally William Powers, Jr. & Jack Ratliff, Another Look at "No Evidence" and
"Insufficient Evidence," 69 Tex. L. Rev. 515 (1991).

 Concerning appellee's subjective belief of good faith, the record reveals the
following evidence:



(1) David Williams testified (without any hearsay objection) that Mrs.
O'Donnell's attorney, Alvin Nored, told him that Mrs. O'Donnell herself
did not believe that she owned any granite, but that she was willing to take
the money from Cactus Canyon under the lease.


(2) Cactus Canyon's representative, Jack Carson, acknowledged that if Texas
Granite Corporation's north line extended all the way up to the south line
of the Snead's 17.56-acre tract, then Texas Granite Corporation would have
a claim to the granite in question. 


(3) Jack Carson understood that whatever granite rights Mrs. O'Donnell had
to convey were for granite located between Texas Granite Corporation's
granite rights and the Snead 17.56-acre tract.


(4) Cactus Canyon acknowledged its own uncertainty about Texas Granite
Corporation's rights in the area known as "the gap" by entering into a
Stipulation of Interest in 1987, wherein the parties acknowledged that
"there may be an overlap or cloud of Lease 1 [the 66.93 acre-tract] upon
the TGC Granite Rights."


(5) In Cactus Canyon I, Cactus Canyon submitted all the evidence it had to
establish its title, including the O'Donnell lease, and the trial court found,
in Finding of Fact number eight, that Cactus Canyon had proved no title to
any portion of the lands in controversy in this action except the title to the
granite in, on, or under the 17.56-acre tract. Andy Carson testified that the
trial court's subjective belief regarding title was honest and reasonable.


(6) Sam McDaniel, the Williamses' trial counsel in that first trial, testified as
an expert witness that a reasonable person looking at the deed records in
July 1984 would believe that Mrs. O'Donnell did not have any granite to
convey.


(7) Mr. McDaniel testified that a reasonable person would have concluded,
from a study of the instruments of record, that Texas Granite Corporation
or its successors in interest owned the granite under the 117-acre tract.


(8) Mr. McDaniel further testified that a reasonable person looking at the title
documents in July 1984 would come to the same conclusion as did the trial
court in finding that Cactus Canyon owned no granite rights below the
17.56-acre tract.



 All this evidence bears on appellees' subjective belief that (1) the O'Donnells had
not retained any granite rights in the 66.93-acre tract, and thus had no granite rights to lease
Cactus Canyon; (2) the only way Mrs. O'Donnell would have had any granite rights would be if
Texas Granite Corporation's 117-acre tract did not abut Snead's 17.56-acre tract, and that in fact
the two tracts did abut; and (3) the granite was owned either by Texas Granite Company, which
had given the Williamses permission to mine, or by Sally Williams, since Texas Granite
Company's disclaimer of the granite would have resulted in the granite rights accruing to the
surface owner, Sally Williams. Appellant has not demonstrated on appeal that the jury's finding
of a good faith trespass was against the overwhelming weight of the evidence as to be clearly
wrong and manifestly unjust. Therefore, we overrule point of error six.



Submission of Question Five

 In points of error nine and ten, appellant contends that the trial court erred in
submitting question five to the jury, concerning the valuation of appellees' mining costs. (3) More
specifically, in point of error nine, appellant argues that appellees were not entitled to the question
because of their defective pleadings. In point of error ten, appellant argues that submitting the
question was improper because their was no evidence to support a finding of good faith, the
prerequisite for allowing cost offsets.

 In order to complain on appeal that an issue in the trial court's charge is erroneous,
a party must timely, properly, and distinctly object, or the complaint is waived. See Tex. R. Civ.
P. 272, 274; Baptist Memorial Hosp., 822 S.W.2d at 74. Moreover, to preserve error, the
complaint on appeal must comport to the objection at trial. Holland, 901 S.W.2d at 765. 
Defendant's only objection at trial to the submission of question five was that there was no
evidence of good faith. See footnote 2, supra. Therefore, we overrule point of error nine
because the complaint on appeal differs from the objection at trial. See Holland, 901 S.W.2d at
765. In our discussion of point of error six, we held that the evidence was sufficient to support
a finding of appellees' good faith. Therefore, we overrule point of error ten.



Sufficiency of Evidence as to Cost Offsets

 In points of error eleven through fourteen, appellant contends that the evidence is
legally and factually insufficient to support the jury's answer to question five. In deciding a no-evidence point, we must consider only the evidence and inferences tending to support the finding
of the trier of fact and disregard all evidence and inferences to the contrary. Burroughs Wellcome
Co. v. Crye, 907 S.W.2d 497, 499 (Tex. 1995); Best v. Ryan Auto Group, Inc., 768 S.W.2d 670,
671 (Tex. 1990). We will uphold the finding if more than a scintilla of evidence supports it. 
Crye, 907 S.W.2d at 499; Seideneck v. Cal Bayreuther Assocs., 451 S.W.2d 752, 755 (Tex.
1970); In re King's Estate, 244 S.W.2d 660, 661 (Tex. 1951). The evidence supporting a finding
amounts to more than a scintilla if reasonable minds could differ in their conclusions. Crye, 907
S.W.2d at 499; Transportation Ins. Co. v. Moriel, 879 S.W.2d 10, 25 (Tex. 1994); see generally
William Powers, Jr. & Jack Ratliff, supra.

 In the instant cause, Joe Williams testified that his costs for mining the granite at
issue were between twelve and fifteen dollars per ton for quarried stone and between sixty-two
and sixty-three dollars per ton for the processed granite. The jury answered that appellees' costs
were fifteen dollars per ton for quarried stone and sixty-two dollars and ninety cents per ton for
processed granite. Given the record evidence, we cannot say that there is no evidence to support
the jury's answer. Furthermore, reviewing the evidence, we cannot say that the jury's answer is
against the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. 
We overrule points of error eleven through fourteen.



Proper Time for Valuation of the Granite (Appellees' Point of Error)

 Appellees perfected their own appeal and raise a single point of error addressing
the proper method to value the granite at issue. 

 The quarrying process begins with clearing the property and drilling holes into
which explosives are loaded. Detonating the explosives physically separates the granite from the
real property, leaving assorted sizes of rock, commonly referred to as "rip rap." Because rip rap
is not commercially desirable, the granite is crushed, screened, and further processed before it has
any real commercial value.

 In questions three and four, the jury was asked the fair market value of the granite
at both the time of initial severance (rip rap stage) and after removal and processing. The jury
responded twenty dollars per ton and seventy-six dollars and fifty cents per ton, respectively. In
a single point of error, appellees maintain that the trial court erred in calculating damages by
valuing the granite after removal and processing as opposed to using the value at the rip rap stage.

 Appellant contends that appellees have failed to preserve error. Appellant urges
that one must file a motion for new trial before complaining on appeal about excessive damages.
See Tex. R. Civ. P. 324(b)(4). However, appellees do not complain about the excessiveness of
the jury's finding. They contest the trial court's calculation in determining the granite's value. 
Appellees raised this issue before the trial court in their motion for judgment. This issue has been
preserved for appellate review; accordingly, we will reach the merits. 

 In the seminal case of Bender v. Brooks, 127 S.W. 168 (Tex. 1910), the Texas
Supreme Court stated the method of valuing minerals in trespass actions:



It is the prevailing rule that in an action for unlawfully working a mine and
extracting coal or ore therefrom, if the taking was not a willful trespass, but was
the result of an honest mistake as to the true ownership of the mine, the measure
of damages is the value of the coal or ore as it was in the mine before it was
disturbed. 


Id. at 170. The standard is difficult to apply because it is virtually impossible to determine the
value of the mineral as it was in the mine before it was disturbed. In approximating this value,
the authorities have recognized alternative methods, namely the royalty and net profit methods. (4) 
Texas law recognizes that, "[i]n `good faith' . . . trespass cases the courts measure damages by
`net profits.'" Maxville-Glasco, 800 S.W.2d at 386; see also Bender, 127 S.W. at 171; Hunt,
791 S.W.2d at 193-94. "Net profits are what remains after a business deducts expenses incurred
in carrying on the business from gross receipts." Maxville-Glasco, 800 S.W.2d at 386-87
(emphasis added). The rationale behind the net profit rule is that an owner "ought not be deprived
of the right of developing and getting out his own mineral and of reaping the profit himself, and
the [good faith] trespasser ought not to be allowed unjust enrichment." See Hughett v. Caldwell
County, 230 S.W.2d 92, 96 (Ky. 1950) (commenting on net-profit rule, also used by Texas
courts).

 In the instant cause, the jury's finding of the granite's value after processing best
approximates gross receipts because it is only at this time that the granite is sold. Valuing the
granite at the rip rap stage does not approximate gross receipts because one customarily does not
sell rip rap granite. Moreover, if the rip rap value were controlling, then the innocent mineral
owner would be denied the opportunity to fully develop the ore, and the trespasser would benefit
by receiving the profit from the granite it improperly converted.

 Appellees argue that the proper valuation is that at the time of severance. In
support of this argument, appellees cite Dahlstrom Corp. v. Martin, 582 S.W.2d 159 (Tex. Civ.
App.--Houston [1st. Dist.] 1979, writ ref'd n.r.e.):



On the other hand, one who inadvertently, or under a claim of right or upon a
bona fide belief of title, encroaches upon the land of another and mines or removes
minerals therefrom is generally held to be liable in damages only for the minerals
removed, based upon their value in situ, that is as they lay in the earth before being
disturbed.



Id. at 161. It is not apparent how Dahlstrom bolsters the Williamses' argument. Dahlstrom
maintains that the value in situ is the value of the minerals as they "lay in the earth before being
disturbed." Id. (emphasis added). Appellees' proposed valuation at the rip rap stage is at a time
after (or just at) severance. Dahlstrom, like Bender before it, simply holds that the in situ value
is controlling without articulating a method to approximate the in situ value. However,
subsequent cases clarify that the net profits method, based on gross receipts, is controlling. 
Appellees should not be allowed to convert the granite and then deny appellant the fullest
opportunity to develop its minerals. We overrule appellees' single point of error.



 CONCLUSION


 For the foregoing reasons, we overrule all the parties' points of error and
affirm the trial court's judgment.



 Marilyn Aboussie, Justice

Before Justices Powers, Aboussie and Kidd

Affirmed

Filed: July 17, 1996

Do Not Publish

1.   The trial court submitted the following question to the jury:


Question No. 6


 Do you find that the Defendants did not act wilfully? 


 You are instructed that a party does not wilfully act if they act in good faith. 
 Good faith means an honest and reasonable belief in the supriority [sic] of
one's title to the granite, and without notice or knowledge of plaintiff's
superior right. 

 Answer "they did not act wilfully" or "they did act wilfully."


 Answer: did not act wilfully
2.   The statement of facts reads in pertinent part:


The defendant (sic.) objects and excepts to Question No. 5 for the reason that the
record was clear there was no good faith in this case, and the question is not
predicated upon the finding that the defendant did not act willfully or in good
faith, which is Question 6. As such, it would tend to imply to the jury that there
-- they can deduct the reasonable and necessary costs independent of a finding
of good faith, and I think that we have hopelessly confused the jury.
3.   The trial court submitted the following question to the jury:


Question No. 5


 What are the reasonable costs, if any, in processing the granite in
question? Answer in dollars and cents per ton, if any.


 The jury answered $15.00 per ton for quarried (rip rap) stone and $62.90
per ton for removed and processed granite.
4.   "Where evidence is not obtainable as to the value of the minerals in situ, the courts may
establish the equivalent of such value by (1) the royalty method, whereby the owner of the
property is allowed the amount for which the landowner could sell the privilege of mining
and removing the minerals under the customary lease or conveyance of the mineral rights,
or (2) the value of the minerals after extraction, either at the mouth of the mine or at some
other point, less the reasonable costs of production and transportation to such point." 54
Am. Jur. 2d Mines & Minerals § 253 (1971).


ir value in situ, that is as they lay in the earth before being
disturbed.



Id. at 161. It is not apparent how Dahlstrom bolsters the Williamses' argument. Dahlstrom
maintains that the value in situ is the value of the minerals as they "lay in the earth before being
disturbed." Id. (emphasis added). Appellees' proposed valuation at the rip rap stage is at a time
after (or just at) severance. Dahlstrom, like Bender before it, simply holds that the in situ value
is controlling without articulating a method to approximate the in situ value. However,
subsequent cases clarify that the net profits method, based on gross receipts, is controlling. 
Appellees should not be allowed to convert the granite and then deny appellant the fullest
opportunity to develop its minerals. We overrule appellees' single point of error.



 CONCLUSION


 For the foregoing reasons, we overrule all the parties' points of error and
affirm the trial court's judgment.



 Marilyn Aboussie, Justice

Before Justices Powers, Aboussie and Kidd

Affirmed

Filed: July 17, 1996

Do Not Publish

1.   The trial court submitted the following question to the jury:


Question No. 6


 Do you find that the Defendants did not act wilfully? 


 You are instructed that a party does not wilfully act if they act in